The JOHNS HOPKINS UNIVERSITY
v.
James M. HUTTON, Jr., et al.

Civ. No. 15098.

United States District Court,
D. Maryland.

April 12, 1971.

John Henry Lewin, Edmund P. Dandridge, Jr., and Venable, Beatjer & Howard, Baltimore, Md., for plaintiff.

John A. Wilson, Michael J. DeSantis and Shearman & Sterling, New York City, and John F. King, Baltimore, Md., for defendants.

FRANK A. KAUFMAN, District Judge.

This seven count action was instituted by Hopkins in 1963. Five years later, after protracted and extensive discovery had been engaged in by both sides, this Court granted Hopkins' motion for summary judgment under the first count stated by Hopkins pursuant to Section 12(2) of the Securities Act of 1933 (the '33 Act). Johns Hopkins University v. Hutton, 297 F.Supp. 1165 (D.Md.1968). The Fourth Circuit, on appeal, held that "genuine issues of material fact preclude[d] the entry of summary judgment on the issue raised by Hutton's plea of the statute of limitations" but that "[o]n all other issues, the district court correctly entered summary judgment for Hopkins." Johns Hopkins University v. Hutton, 422 F.2d 1124, 1126 (4th Cir. 1970).[1] Accordingly, the Fourth Circuit "[a]ffirmed in part, reversed in part, and remanded for further proceedings consistent with [its] opinion." 422 F.2d, *supra* at 1132.

In its earlier opinion, this Court wrote (297 F.Supp., *supra* at 1172–1173):

Hopkins' amended complaint is set forth in seven counts: (1) Section 12(2) of the '33 Act; (2) Section 10(b) of the '34 Act and Rule 10b–3 of the Securities and Exchange Commission (S.E.C.); (3) Section 10(b) of the '34 Act and Rule 10b–5 of the S.E.C.; (4) Section 15(c) (1) of the '34 Act; (5) Section 17(a) of the '33 Act; and (6) and (7) under the common law for (a) false representation and fraudulent conduct and (b) making false representations negligently and with reckless indifference as to their truth.

Hopkins' motion for summary judgment was presented with regard to each of the first five or statutory counts. Near the close of his rebuttal, during oral argument on Hopkins' motion for summary judgment, Hopkins' counsel stated that if the Section 12(2) equitable relief sought by Hopkins under count one of the amended complaint should be granted, Hopkins would consider itself fully satisfied (Tr. 458–463). Therefore, since summary judgment will be granted to Hopkins under count one, the issues raised by the other counts are moot. [Footnote omitted.]

Following the remand of this case by the Fourth Circuit to this Court, Hopkins pressed its claims for summary judgment, as to liability only, under the second,[2] third,[3] and fifth counts.[4]

---

1. In connection with Hutton's Section 13 limitations plea, the question posed is whether Hopkins, insofar as the first count under Section 12(2) of the '33 Act is concerned, filed this action within one year after the moment when Hopkins discovered, or, by the exercise of reasonable diligence, should have discovered, LaPiere's misrepresentations and omissions. Judge Butzner (422 F.2d, *supra* at 1131) held that that issue raised, in this case, a factual dispute which could not be determined on summary judgment. Judge Butzner also wrote (at 1131, n. 7):

 Hopkins also claims that Hutton is estopped to plead the statute of limitations because Hutton withheld unfavorable information that came to its at-

tention after the sale. The district judge did not rule on this issue, and in the absence of the necessary factual background, we express no opinion about it.

That estoppel contention, even if it poses questions in addition to those presented by Hutton's limitations plea, raises factual issues herein which cannot be determined short of trial.

2. The second count is stated under Section 10(b) of the Securities Exchange Act of 1934 (the '34 Act) and Rule 10b–3 of the Securities and Exchange Commission (S E.C.). Section 10(b) provides: *Manipulative and deceptive devices.*

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(a) * * *

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–3 reads:

*Employment of manipulative and deceptive devices, by brokers or dealers.*

It shall be unlawful for *any broker or dealer,* directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, to use or employ, in connection with the purchase or sale of any security otherwise than on a national securities exchange, any act, practice, or course of business defined by the Commission to be included within the term "manipulative, deceptive, or other fraudulent device or contrivance", as such term is used in section 15(c) (1) of the act. [Emphasis supplied.]

Rule 15c1–2 states:

*Fraud and misrepresentation.*

(a) The term "manipulative, deceptive, or other fraudulent device or contrivance", as used in section 15(c) (1) of the act (sec. 2, 52 Stat. 1075; 15 U.S.C. 78o(c) (1), is hereby defined to include any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

(b) The term "manipulative, deceptive, or other fraudulent device or contrivance", as used in section 15(c) (1) of the act, is hereby defined to include any untrue statement of a material fact and any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, which statement or omission is made with knowledge or reasonable grounds to believe that it is untrue or misleading.

(c) The scope of this section shall not be limited by any specific definitions of the term "manipulative, deceptive, or other fraudulent device or contrivance" contained in other rules adopted pursuant to section 15(c) (1) of the act.

3. The third count is stated under Section 10(b) of the '34 Act and under Rule 10b–5 of the S.E.C. That Rule reads as follows:

*Employment of manipulative and deceptive devices.*

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

4. The fifth count is stated under Section 17(a) of the '33 Act, which provides:

*Fraudulent interstate transactions.*

(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Hopkins has not sought summary judgment under Count IV, VI or VII. Count IV is based upon section 15(c) (1) of the '34 Act and Rule 15c1–2(a) and (b) promulgated thereunder. Counts VI and VII are common law counts.

Additionally, both sides have presented their respective contentions concerning standards applicable in connection with the determination of damages under one or more of the counts.[5]

Further, Hopkins has also filed motions to strike Hutton's demand for a jury trial under Count I (the Section 12(2) count) and to sever that count for separate trial.

While the earlier opinions in this case of the Fourth Circuit and of this Court were written in the context of Hopkins' Section 12(2) summary judgment motion, and not in the context of Hopkins' current 10b–3, 10b–5 and 17(a) motions, the underlying findings of fact previously made by this Court and approved by the Fourth Circuit provide the factual underpinnings for determination of those issues which are raised by Hopkins' pending summary judgment motions. After review and reconsideration of the record to date, this Court declines, as suggested by Hutton, to revise, and also declines, as suggested by Hopkins, to amplify, any of its earlier factual determinations.

## I. SECTIONS 10(b) AND 17(a)

The elements of the three counts, brought under 10(b) and 17(a), are almost identical. Many of those elements are also substantially similar to comparable elements in the 12(2) cause of action. Thus, Hutton violated Rules 10b–3 and 10b–5 and Section 10(b) of the '34 Act, and Section 17(a) of the '33 Act, if, as a broker,[6] Hutton, by use of the mails or any means or instrumentality of interstate commerce, knowingly, in connection with the sale [7] of a security to Hopkins, made an untrue statement of material fact, and, knowingly, in that connection, omitted to state a material fact necessary in order to render the statements Hutton made not misleading under the circumstances in which the statements were made, and Hopkins, in ignorance of the truth, relied upon misleading information furnished to it by Hutton or relied upon the information in fact furnished by Hutton not knowing of the omitted material information. The findings and holdings of the Fourth Circuit and of this Court in the earlier opinions have established that the production payment sold to Hopkins was a security; [8] that Hutton is responsible

---

5. The parties have also presented a number of discovery and evidentiary questions which will require resolution if this case goes to trial in connection with any damage issue.

6. Rule 10b–5 and Section 10(b) of the '34 Act and Section 17(a) of the '33 Act make it unlawful for "any person" to engage in the conduct proscribed by those provisions. Rule 10b–3 refers only to brokers or dealers. (See n. 2, n. 3 and n. 4 *supra*).

7. Purchasers, such as Hopkins, can bring actions under Rules 10b–3 and 10b–5 and Section 17(a). Professor Loss has noted, III L. Loss, Securities Regulation 1427 (1961 ed.) (hereafter *"Loss"*), that Rule 10b–5 "merely borrows the language of § 17(a) * * * except for the reference in Clause (2) [of Section 17(a)] to *obtaining money or property by means of* an untrue statement or half-truth * * *" (emphasis in original); and that Rule 10b–5 "applies" those words of Section 17(a) to occurrences "in connection with the purchase or sale of any

security" (with regard to the original purpose of the words "obtaining money or property," see III *Loss* at 1439). Section 17(a) itself speaks of occurrences *"in the offer or sale of securities"* (emphasis supplied). In this case, LaPiere obtained for Trice money from Hopkins not only *in connection with* a sale, but directly as the consideration for the sale. Thus, herein, it is not necessary to analyze whether the Rule 10b–5 words—*"in connection with* the purchase or sale"—can in some factual settings have broader application than the Section 17(a) words —*"in* the offer or sale" (emphases supplied). *See* SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 858–862 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); III *Loss* at 1454, n. 35.

8. The term "security," as used in the '33 Act, is defined by Section 2(1) thereof as follows:
 (1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, cer-

for LaPiere's misrepresentations and omissions (297 F.Supp., *supra* at 1209–1213, 1236–1237; 422 F.2d, *supra* at 1130); that LaPiere did make material misrepresentations and omitted to furnish Hopkins with material information LaPiere possessed (297 F.Supp., *supra* at 1217–1218; 422 F.2d, *supra* at 1128–1129); that the mails or facilities of interstate commerce were used by LaPiere in connection therewith (297 F.Supp., *supra* at 1213–1214; 422 F.2d, *supra* at 1128); that Hopkins is a type of investor entitled to protection under the federal securities laws (297 F.Supp., *supra* at 1217); and that Hopkins did not have knowledge of LaPiere's material misstatements and material omissions prior to the consummation of Hopkins' purchase of the production payment (297 F.Supp., *supra* at 1220–1222; 422 F.2d, *supra* at 1129).

## A. SCIENTER

This Court repeats its refusal to find, in the current summary judgment context of this case, that LaPiere acted "as an evil man," 297 F.Supp., *supra* at 1198, n. 20, but also repeats its conclusion (at 297 F.Supp., *supra* at 1219–1220) that a—

\* \* \* buyer under Section 12(2) does not have to prove that the seller had a subjectively evil state of mind in making false statements or omissions. Further, in order to avoid liability, if all of the other elements of a 12(2) cause of action exist, a seller must show that he did not know of the misstatements or omissions, or could not have known of them, in the exercise of reasonable care. \* \* \*

The standards of 12(2) are clear when it comes to ascertaining whether

tificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

The term "security," as used in Section 10(b) of the '34 Act and in Rules 10b–3 and 10b–5, is defined in Section 3(a) (10) of the Act as follows:

(10) The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the forego-

ing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

The Supreme Court in Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), considered the respective definitions in the two Acts to be "virtually identical" (at 336 and 342, 88 S.Ct. 548). In both Acts, the definition of a security includes an "investment contract." The Fourth Circuit, affirming this Court's determination (297 F.Supp., *supra* at 1214–1217), held the production payment in this case to be an "investment contract" and a "security" (422 F. 2d, *supra* at 1127, 1128), and, with regard to the Trice guarantee, wrote (at 1128):

\* \* \* Whether the guarantee is a part of the production payment or collateral to it is immaterial. In either event the entire transaction, including the guarantee, falls within the statutory definition of a security.

Thus, the absence of the word "guarantee" from the '34 Act definition, and its presence in the '33 Act definition, *see* II *Loss* at 795–96, is immaterial in this case since the "entire transaction" falls within the definition of "investment contract" and of "security" as those words are used in the '34 Act.

LaPiere's conduct is actionable. What did LaPiere know? What could he have known in the exercise of reasonable care? The undisputed facts speak loudly and clearly as to what information LaPiere had in his possession. There is no evidence in the record that LaPiere did not have, or that it would be possible to prove that he did not have, such information in his possession and that LaPiere did not know and could not have known with the exercise of reasonable diligence that he made material misstatements and material omissions in his communications to Hopkins. * * * [Citations omitted.]

 Under Section 12(2) of the '33 Act, the burden is upon the defendant to prove that "he did not know, and in the exercise of reasonable care could not have known" of the false or misleading nature of the misstatement or omission upon which liability under that section is alleged. In actions under Sections 10(b) of the '34 Act and 17(a) of the '33 Act, the element of scienter must be proved by the plaintiff. Sitting by designation in this Court as a District Judge in Baumel v. Rosen, 283 F.Supp. 128 (D.Md.1968), aff'd in part, rev'd in part, 412 F.2d 571 (4th Cir. 1969),[9] cert. denied, 396 U.S. 1037, 90 S.Ct. 681, 24 L.Ed.2d 681 (1970), Judge Winter noted (at 139):

> * * * Numerous authorities have discussed the quantum of proof to sustain a cause of action under Rule 10b–5 and how a cause of action under Rule 10b–5 differs from a cause of action for common law fraud. * * *

After reviewing the authorities, Judge Winter concluded (at 140):

> * * * In the view of the Court, Rule 10b–5 should be so construed to give effect to its remedial purpose and the remedial purpose of the Act under which it was adopted. S. E. C. v. Capital Gains Research Bureau, 375

U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). It follows that proof of common law fraud is not required to sustain a cause of action under Rule 10b–5.

In Globus v. Law Research Service, Inc., 418 F.2d 1276, 1290 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970), a case involving both 10b–5 and 17(a), the Second Circuit, in approving the District Court's jury charge, wrote:

> The jury was told that before the appellants could be held liable to plaintiffs, it must conclude that appellants "knew the statement was misleading or *knew of the existence of facts which, if disclosed, would have shown it to be misleading*." The trial court thus shared the view often advanced in this circuit that some form of scienter greater than mere negligence was required in order to permit plaintiffs to recover damages in a private action under 17(a) or 10(b). * * * But the trial judge refused to direct the jury that it must find appellants intended to defraud appellees before it determined that there was a violation of either of those sections.
>
> The necessity of some intent to defraud or scienter has been the subject of much debate. * * * But the trend is clearly away from enforcing a scienter requirement equal to the "intent to defraud" required for common law fraud. Before there may be a violation of the securities acts there need not be present all of the same elements essential to a common law fraud, * * *. [Emphasis supplied; citations omitted.]

*See also* S. E. C. v. Texas Gulf Sulphur Co., 401 F.2d 833, 854–855 (2d Cir. 1968); Myzel v. Fields, 386 F.2d 718, 734–735 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); and Kohler v. Kohler, 319

---

9. Judge Bryan, for the Fourth Circuit, specifically approved (at 573) of the analysis of the Act (Section 10(b) of the

'34 Act) and the Rule (10b–5) by the Court below.

F.2d 634, 637 (7th Cir. 1963), where it was held that Section 10(b)—

\* \* \* was meant to cover more than deliberately and dishonestly misrepresenting or omitting material facts which ordinarily are badges of fraud and deceit. See Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961); Texas Continental Life Ins. Co. v. Bankers Bond Co., 187 F.Supp. 14 (W.D.Ky. 1960).

█ In this case, the record discloses, as the Fourth Circuit and this Court have found and held, evidence which establishes beyond question that LaPiere "knew of the existence" of material facts which he failed to disclose to Hopkins. As Judge Butzner wrote (422 F. 2d, *supra* at 1128):

\* \* \* LaPiere, however, *knew* that D & M had neither estimated all of the wells nor provided a basis for calculating Hopkins' share of the future net revenues. Moreover, LaPiere omitted to tell Hopkins that in order to show future net revenues of $6,-500,000 it was necessary to substitute for conservative estimates on some of the wells higher estimates from other · sources. [Emphasis supplied.]

Accordingly, this Court concludes that, in this case, the undisputed facts provide the required quantum of scienter.

### B. RELIANCE

█ In the earlier opinions in this case, the Fourth Circuit and this Court have held that reliance by the purchaser is not an element of a cause of action under Section 12(2) of the '33 Act. 422 F.2d, *supra* at 1129–1130; 297 F.Supp., *supra* at 1222–1223. However, in 10(b) actions, "most of the authorities require *some* reliance by the plaintiff upon the data that was furnished" (emphasis supplied). Baumel v. Rosen, 283 F.Supp., *supra* at 140. In *Baumel*, Judge Winter

cited, *inter alia,* List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir.) cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965), in which the Second Circuit held in a 10(b) case that the plaintiff must show reliance, in order to establish causation, and materiality, and in which the Second Circuit wrote (at 462):

\* \* \* Insofar as is pertinent here, the test of "reliance" is whether "the misrepresentation is a substantial factor in determining the course of conduct which results in [the recipient's] loss." Restatement, Torts § 546 (1938); accord, Prosser, Torts 550 (2 ed. 1955); 1 Harper & James, Torts 583–84 (1956). The reason for this requirement, as explained by the authorities cited, is to certify that the conduct of the defendant actually caused the plaintiff's injury. The basic test of "materiality," on the other hand, is whether "a reasonable man would attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question." Restatement, Torts § 538(2) (a); accord, Prosser, Torts 554–55; 1 Harper & James, Torts 565–66. Thus, to the requirement that the *individual plaintiff* must have acted upon the fact misrepresented, is added the parallel requirement that a *reasonable man* would also have acted upon the fact misrepresented.[3] [Emphasis in original.]

Footnote 3 in the *List* opinion states:

3. Care must be taken to distinguish the requirement that a reasonable man would have *believed* the fact misrepresented. There is a marked present-day trend away from this common law requirement. Prosser, Torts 552–54; 1 Harper & James, Torts 582–83. The requirement may not exist at all under Rule 10b–5. See III Loss, Securities Regulation 1438. [Emphasis in original.][10]

10. In Bishop v. E. A. Strout Realty Agency, 182 F.2d 503 (4th Cir. 1950), a case of common law deceit, Judge Parker wrote (at 505):

█

We do not think that plaintiffs are precluded of recovery because they accepted and relied upon the representations of Davis as to the depth of the

Even if that "right to rely" requirement exists in this case, there is nothing in the record to indicate that LaPiere, or anyone else, did or said anything which would have led Hopkins, as a reasonable man, to suspect that material information was being misrepresented to or withheld from Hopkins. LaPiere's misrepresentations and omissions were not obvious to "even the most credulous mind." Clement A. Evans & Co., Inc. v. McAlpine, 434 F.2d 100 (5th Cir. November 5, 1970). Nor did Hopkins have "ready access to the information" which LaPiere misrepresented or omitted to furnish. City National Bank of Fort Smith, Ark. v. Vanderboom, 422 F.2d 221, 231 (8th Cir.), cert. denied, 399 U. S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970). *See* Gordon v. Lipoff, 320 F. Supp. 905 (W.D.Mo. December 30, 1970). *See also* the discussion by this Court in the context of 12(2) at 297 F. Supp., *supra* at 1221.

To return to List v. Fashion Park, Inc., 340 F.2d 457, *supra*, it is to be noted that Judge Waterman, in holding that misrepresentation must be "a substantial factor in determining the course of conduct which results in [the recipient's] loss," wrote (at 462):

* * * The reason for this [reliance] requirement, as explained by the authorities cited, is to certify that the conduct of the defendant actually caused the plaintiff's injury. * * *

* * * * * *

* * * Assuredly, to abandon the requirement of reliance would be to facilitate outsiders' proof of insiders' fraud, and to that extent the interpretation for which plaintiff contends might advance the purposes of Rule 10b–5. But this strikes us as an inadequate reason for reading out of the rule so basic an element of tort law as the principle of causation in fact. * * * [11]

However, as the Second Circuit recently stated in Crane Company v. Westinghouse Air Brake Company, 419 F.2d 787, 797 (2d Cir. 1969):

* * * Although we have held that reliance was necessary under 10b–5, List v. Fashion Park, Inc., *supra*, at 340 F.2d [457,] 463, reliance is an element of causation which plays little role in nondisclosure cases. * * *

water without making soundings or taking other steps to ascertain their truth or falsity. The depth of the water was not a matter that was apparent to ordinary observation; Davis professed to know whereof he was speaking; and there was nothing to put plaintiffs on notice that he was not speaking the truth. There is nothing in law or in reason which requires one to deal as though dealing with a liar or a scoundrel, or that denies the protection of the law to the trustful who have been victimized by fraud. The principle underlying the caveat emptor rule was more highly regarded in former times than it is today; but it was never any credit to the law to allow one who had defrauded another to defend on the ground that his own word should not have been believed. * * *

11. It may indeed be that the reliance requirement in fraud actions analytically functions principally to establish the causal connection between the wrongful conduct and the resulting damage. *See,* e. g., W. Prosser, Law of Torts (3d ed. 1964), at 729–30; L. Harper & F. James, the Law of Tort § 7.13; *and see* Crane Company v. Westinghouse Air Brake Company, 419 F.2d 787, 797 (2d Cir. 1969), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970) ; Vine v. Beneficial Finance Co., 374 F.2d 627, 635 (2d Cir. 1967), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967) ; Voege v. American Sumatra Tobacco Corporation, 241 F.Supp. 369, 375–376 (D.Del.1965), for cases in which the plaintiff was not required to show reliance since the causal connection between violation of the Act and the resulting injury was otherwise alleged or proved. *See also* Chasins v. Smith, Barney & Co., 438 F.2d 1167 (2d Cir. March 2, 1971). *And see* Robinson v. Cupples Container Co., 316 F.Supp. 1362, 1365–66 (N.D.Cal.1970) ("causation" sufficiently alleged in complaint by allegation of reliance).

*See also* Chasins v. Smith, Barney & Co., Inc., 438 F.2d 1167 (2d Cir. March 2, 1971).[12] and in VI *Loss* (1969 Supp.) at 3879, the author wrote:

The Government, in filing a memorandum [in the *List* case] as *amicus curiae* on the petition for a writ of *certiorari,* took exception to the Second Circuit's formulation: Framing the test in terms of "reliance" is not particularly helpful when dealing with complete nondisclosure. The appropriate inquiry there is whether the nondisclosure caused the injury. * * *

There is a factual difference between complete nondisclosure, e. g., failure of the buyer to disclose he is an insider, as opposed to partial disclosure with a material omission, but, in this case, LaPiere's "causation" of Hopkins' injury, by the combination of his misrepresentations and omissions, has been established, as the Fourth Circuit found and held (422 F.2d, *supra* at 1130):

* * * Information about future net revenues was essential to Hopkins' decision to purchase, and this information was tainted by LaPiere's material misrepresentations and omissions. These facts establish as a matter of law sufficient causal relationship between LaPiere's violation of the Act and Hopkins' injury. Hopkins need not also prove that the defects in LaPiere's data had a decisive effect on its contract. Cf. Mills v. Electric Auto-Lite Co., 396 U.S. 375 [, 90 S.Ct. 616, 24 L.Ed.2d 593] (1970). * * *

Mills v. Electric Auto-Lite Co., cited by the Fourth Circuit in the portion of its opinion in this case quoted immediately *supra,* was a derivative action by stockholders of Electric Auto-Lite brought on behalf of the company under Section 14(a) of the Exchange Act and Rule 14a–9 to attack Electric Auto-Lite's merger into Linotype Company, on the ground that the proxy solicitation for the vote to approve the merger was misleading because it omitted material facts. The District Court granted plaintiffs summary judgment on the issue of liability, 281 F.Supp. 826 (N.D.Ill.1967). The Seventh Circuit remanded for determination of "whether the misleading statement and omission caused the submission of sufficient proxies." (403 F. 2d 429, 436 (1968)). After noting (396 U.S. at 380, 90 S.Ct. at 619) that "[t]he Court of Appeals acknowledged that this test corresponds to the common-law fraud test of whether the injured party relied on the misrepresentation," the Supreme Court reversed, stating (at 384–385, 90 S.Ct. at 621–622):

Where the misstatement or omission in a proxy statement has been shown to be "material," as it was found to be here, that determination itself indubitably embodies a conclusion that the defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote. This requirement that the defect have a significant *propensity* to affect the voting process is found in the express terms of Rule 14a–9, and it adequately serves the purpose of ensuring that a cause of action cannot be established by proof of a defect so trivial, or so unrelated to the transaction for which approval is sought, that correction of the defect or imposition of liability would not further the interests protected by § 14(a).

There is no need to supplement this requirement, as did the Court of Appeals, with a requirement of proof of whether the defect actually had a decisive effect on the voting. Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation

---

12. In *Chasins,* the Second Circuit held that "[t]o the extent that reliance is necessary for a finding of a 10b–5 violation in a nondisclosure case such as this, the test is properly one of tort 'causation in fact.'" (Page 1172).

itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. This objective test will avoid the impracticalities of determining how many votes were affected, and, by resolving doubts in favor of those the statute is designed to protect, will effectuate the congressional policy of ensuring that the shareholders are able to make an informed choice when they are consulted on corporate transactions. Cf. Union Pac. R. Co. v. Chicago & N. W. R. Co., 226 F.Supp. 400, 411 (D.C.N.D.Ill. 1964); 2 L. Loss, Securities Regulation 962, n. 411 (2d ed. 1961); 5 id., at 2929–2930 (Supp. 1969). [Footnotes omitted; emphasis in original.] In *Mills*, the Supreme Court noted the "impracticalities" (at 385, 90 S.Ct. 616) of inquiring into "[r]eliance by thousands of individuals" (at 380, 90 S.Ct. 616). *See also* Kahan v. Rosenstiel, 424 F.2d 161, 173–174 (3d Cir. 1970) (a class action, brought pursuant to Rule 10b–5 in which the Third Circuit cited and applied *Mills* on the question of reliance).

■ Hopkins contends that *Mills* (and *Rosenstiel*) have dispensed with the requirement of reliance, *per se*, in 10(b) and similar cases, where materiality and causation are present. This Court, in this case, does not need herein to accept or repudiate that contention, since, in this case, inquiry into the fact of reliance is not impractical and such inquiry undisputedly establishes LaPiere's misrepresentations and omissions, their materiality, and Hopkins' reliance upon them. Materiality presents the identical factual and legal questions under the 10(b) and 17(a) counts in this case as under the 12(2) count, and thus has already been determined by the Fourth Circuit's affirmance (422 F.2d, *supra* at 1128–1129) of this Court's determination of materiality under the 12(2) count (297 F.Supp., *supra* at 1217–1218).[13] While reliance as a legal concept was not considered, as such, by either the Fourth Circuit or by this Court in connection with the 12(2) count, both opinions set forth factual determinations that Hopkins did in fact act upon and indeed seek information from LaPiere concerning the oil reserves and that LaPiere induced Hopkins to purchase the production payment. It is not necessary that Hopkins, in making its decision to purchase, relied solely on the information LaPiere presented to it. It is only necessary that that information was "a substantial factor in determining the course of conduct which results in [the recipient's, here Hopkins'] loss." List v. Fashion Park, Inc., *supra*, 340 F.2d at 462. The record in this case leaves no doubt that Hopkins asked for, was furnished with, and carefully considered all data concerning oil reserves. And it was in connection with just such data that LaPiere made misrepresentations and omissions. Hopkins' reliance in this case thus exceeds the degree of "some"—the standard set forth by Judge Winter in Baumel v. Rosen, *supra*, 283 F.Supp. at 140, in the course of setting forth his "reading" and "employment" of Section 10(b) and Rule 10b–5—a "reading" and an "employment" which were specifically approved by Judge Bryan, speaking for himself and Judges Sobeloff and Boreman. 412 F.2d, *supra* at 574. In this case, materiality and causation, and reliance in and of itself, are independently established by the undisputed facts insofar as the two 10(b) counts are concerned.

13. Thus, Judge Butzner wrote (at 1129–1130) that "[c]learly, a 'reasonable man would attach importance' to this discrepancy of over a million dollars"; that "the discrepancies in basic data are so large, and the facts misrepresented and withheld are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality"; and that "[i]nformation about future net revenues was essential to Hopkins' decision to purchase, and this information was tainted by LaPiere's material misrepresentations and omissions."

### C. SECTION 17(a)

The Section 17(a) count requires no greater quantum of scienter on the part of Hutton, or of reliance by Hopkins, than is required in 10(b) actions. Nor does Section 17(a) establish any higher standards with regard to a plaintiff's "right to rely" than do Section 10(b) and Rules 10b-3 and 10b-5. In this case, the undisputed facts fit the statutory and regulatory requirements of Section 10(b), of Rules 10b-3 and 10b-5, and of Section 17(a), and of each of the elements thereof. Therefore, Hopkins is entitled to summary judgment with regard to liability under the second (10b-3), the third (10b-5), and the fifth (17(a)) counts.

### II. NATURE OF RELIEF

The question is presented as to whether Hopkins, being entitled to relief under each of those three counts, has the right to elect to rescind its transaction with Hutton and to receive back the $1,300,000 it paid for the production payment plus interest,[14] or whether Hopkins is confined to damage relief under those counts. Hopkins' right, under those counts, to rescind its transaction is governed by the standards set forth in Baumel v. Rosen, 412 F.2d 571, *supra*. In that 10b-5 case, Judge Bryan held that plaintiffs were entitled to damages but were not entitled to rescind because they had not tendered the return of the shares of stock involved in *Baumel* until too long after the date upon which they had discovered that the defendants, as purchasers and corporate insiders, had made material misrepresentations and had omitted to disclose material facts concerning the value of the shares of stock sold by plaintiffs. Judge Bryan wrote (412 F.2d at 574):

\* \* \* Rescission is a radical move, and the law exacts the election

of that course, to be asserted without wait. The demand is that advice of the determination be given within a reasonable time after discovery of the ground for rescission.

This principle is stringently administered. Reasonable time is inceptive from the receipt by the rescinder of word putting him on notice. It is then incumbent upon him to pick up the scent and nose to the source. See Friedman, Delay As a Bar to Rescission, 26 Cornell Law Quarterly 426, 432, text at footnote 31 and authorities cited therein (April 1941). If the quest confirms the suspicion, then he must make decision with reasonable dispatch. Failing this, entitlement to rescission disappears.

In this case, the Fourth Circuit, in reversing this Court's grant of full summary judgment under the first (12(2)) count, held that there were "genuine issues of material fact" in connection with whether Hopkins "used due diligence after its purchase on March 1, 1961 to discover the wrongs about which it now complains" (422 F.2d, *supra* at 1126, 1130) and also whether, prior to November 1, 1963,[15] Hopkins' conduct met the test of the "objective standard of reasonable diligence on the part of the buyer in making discovery" (422 F.2d, *supra* at 1131). Similarly, under the standard established in *Baumel* by Judge Bryan, the question of whether Hopkins has timely sought rescission presents, under the second, third and fifth counts, a triable issue of fact. True, Hopkins tendered the production payment to Hutton not later than the time Hopkins filed this suit (297 F.Supp., *supra* at 1224, n. 33). But whether Hopkins should have tendered and/or commenced suit earlier than November 1, 1963 depends upon whether Hopkins should have, before that date, "pick[ed] up the scent and

---

14. At the rate of 6% from March 1, 1961 as set forth in this Court's decree in connection with its earlier (and partially reversed) grant of summary judgment under the 12(2) count. 297 F.Supp., *supra* at 1227–1230.

15. Hopkins instituted this suit on November 1, 1963. See n. 1, *supra*.

nose[d] to the source." (412 F.2d, *supra* at 574). Hopkins is thus not entitled to the summary grant of relief in the form of rescission under Counts II, III or V. To gain that result, Hopkins must succeed at trial in establishing by the preponderance of the evidence that it demanded rescission "within a reasonable time after discovery of the ground for rescission" (412 F.2d, *supra* at 574).

■ Hopkins is, however, if it so desires, entitled to opt for damages under Counts II, III and V rather than for rescission.[16] Seemingly, the measure of damages under each of those counts would be the same. And the standard which would prevail would be that embodied in the so-called "out-of-pocket" rule. Sackett v. Beaman, 399 F.2d 884, 891 (9th Cir. 1968); Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner and Smith, Inc., 303 F.2d 527, 533 (10th Cir. 1962); Kohler v. Kohler Co., 208 F.Supp. 808, 825 (E.D.Wis 1962), aff'd, 319 F.2d 634 (7th Cir. 1963); *see also* Myzel v. Fields, 386 F. 2d, *supra* at 745–747; Janigan v. Taylor, 344 F.2d 781, 786 (1st Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L. Ed.2d 120 (1965). While it has been suggested that the benefit of the bargain rule may "maximize the deterrent effect of Rule 10b–5," VI *Loss* (1969 Supp.) at 3923, no one has specifically advocated that a broker, such as Hutton, as opposed to a seller, such as Trice, should be subjected to that latter rule. And Judge Bryan's comment in *Baumel* (412 F.2d *supra* at 576), that "[i]t must be recalled that while a defrauding party is not to be excused, neither is he to be punished," is the coup de grace to Hopkins' plea to this Court to blaze a new trail, to give to Hopkins the benefit of its bargain with Trice at the expense of Hutton, to require Hutton to make good that bargain which Hopkins thought it had purchased from Trice, and hopefully, as Hopkins seems to put it, to increase the possibility of deterring future LaPieres from misrepresenting or omitting to disclose material facts to prospective purchasers.

### III. JURY

■ There remains Hopkins' motion to strike Hutton's jury demand with regard to Count I under 12(2) and to sever that count for trial. The determination of the questions raised by that motion requires an analysis of the several avenues of relief which Hopkins may pursue under the seven counts in this case, their relationship to one another, and the application of the Seventh Amendment's jury trial guarantee to each of those avenues of relief.

This Court has earlier determined that "Hopkins' only remedy under 12(2) is by way of rescission" (297 F.Supp., *supra* at 1226). Judge Butzner did not specifically state that rescission was the *only* remedy available to Hopkins under the 12(2) count, though he indicated (422 F.2d, *supra* at 1131) approval of this Court's reasoning with regard to the application of the remedy provisions of 12(2). This Court hereby affirms its earlier analysis and holding that, in the factual context of this case, rescission is the *only* remedy available to Hopkins under the first (12(2)) count. 297 F. Supp., *supra* at 1224–26.

By contrast, Hopkins, if it establishes liability under one or more of the counts other than Count I, can seemingly elect initially to pursue rescission rather than damages, and damages thereafter only if it cannot obtain rescission. Sackett v. Beaman, *supra*, 399 F.2d at 891; *see* Myzel v. Fields, 386 F.2d, *supra* at 740–749; Rogen v. Ilikon Corp., 361 F.2d 260, 268–269 (1st Cir. 1966); Baumel v. Rosen, 283 F.Supp., *supra* at 145; III *Loss* at 1792 et seq.; Prosser, *supra* at ch. 20. In some instances, the pursuit of rescission is not possible at law and can be maintained only in equity. In this case, it would seem that no law court could or would have provided,

16. As will be discussed *infra*, at p. 262, Hopkins has no such available election under the 12 (2) count (Count I).

within the traditional pattern of legal remedies, the relief Hopkins seeks under Count I. *See* 1 Pomeroy, Equity Jurisprudence §§ 110, 140 and 175(a) (5th ed. 1941). For Hopkins, under Count I, cannot obtain the return of the purchase price, plus interest, without itself conveying the oil production payment to Hutton, and that conveyance requires a carefully devised, complex decree, particularly since changes in the oil production rights have taken place since Trice conveyed them to Hopkins on March 1, 1961. 297 F.Supp., *supra* at 1224–1226. The solution of questions relating to both the form and the substance of the assignment documents requires either a number of rulings by the Court, or agreements negotiated by the parties under the supervision of the Court, or both. *See* 297 F.Supp., *supra* at 1235–1236. The documents themselves reveal the complexities inherent in their preparation. 297 F.Supp., *supra* at 1237–1258. In sum, the final decree calling for payment of money to Hopkins and conveyance of oil production rights to Hutton necessitates a "final award * * * partially in favor of both litigants," 1 Pomeroy, *supra* at § 175(a). Such relief can be fashioned in equity but not in law. Further, in this case, Hopkins is asking this Court to require Hutton, the seller's broker, not Trice, the seller, to accept the return by Hopkins of the oil production payment and to reimburse Hopkins for the purchase price plus interest. It is at least doubtful as to whether such a remedy, applying rescissional type relief against the broker of the seller, was known at law, and as to whether the grant of such relief would not have required the exercise of powers by a court sitting in equity, prior to the merger between law and equity.

Section 12(2) itself provides that a plaintiff—

* * * may sue either *at law or in equity* in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security. [Emphasis supplied.]

That section was enacted into law in 1933, prior to the merger of law and equity in 1938 under the Federal Rules of Civil Procedure. The words of 12(2) could perhaps be construed to establish in any 12(2) action concurrent jurisdiction in law and in equity. But, in the absence of any illuminating legislative history, those words would seem more likely to reflect a congressional policy to permit a suit at law, or in equity, in accordance with traditional standards governing the exercise of jurisdiction at law or in equity. *See* Deckert v. Independence Shares Corp., 311 U.S. 282, 287–288, 61 S.Ct. 229, 85 L.Ed. 189 (1940).

Thus, it would appear that rescission under the 12(2) count, and seemingly also the rescissional relief which Hopkins contends is available to it under one or more of the other counts, may well lie only in equity and not in law. But even assuming that conclusion *arguendo*, it does not follow that in this case Hutton can be denied a jury trial of the factual issues in connection with which Hopkins must prevail, before it is entitled to rescission under any count in this case, including Count I. Ross v. Bernhard, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970); Simler v. Conner, 372 U.S. 221, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963); Dairy Queen v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); Beacon Theatres v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); Bruce v. Bohanon, 436 F.2d 733 (10th Cir. 1971); Tights, Inc. v. Stanley, 441 F.2d 336 (4th Cir. April 7, 1971).[17]

17. In Ross v. Bernhard, *supra*, the Court held that the Seventh Amendment required a jury trial, if demanded, in connection with a legal claim stated in a stockholders' derivative suit. In that case, Mr. Justice White wrote (396 U.S. at 533, 90 S.Ct. at 735):

The Seventh Amendment preserves to litigants the right to jury trial in suits at *common* law—"not merely suits,

The Seventh Amendment to the Constitution provides:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.

*Beacon Theatres* and *Dairy Queen* teach that when legal and equitable issues are presented in one case, it is "only under the most imperative circumstances, circumstances which in view of the flexible procedures of the Federal Rules we cannot now anticipate, can the right to a jury trial of legal issues be lost through prior determination of equitable claims." Beacon Theatres v. Westover, *supra* 359 U.S. at 510–511, 79 S.Ct. at 957, quoted in part in Dairy Queen v. Wood, *supra,* 369 U.S. at 472–473, 82 S.Ct. 894. Whether Hopkins moved quickly enough to satisfy Section 13 and/or the *Baumel* rescission test does not present circumstances more exceptional than those in *Beacon Theatres* and *Dairy Queen.*

In this case, at this time, the only remaining triable issue of fact under Count I is the Section 13 limitations issue; and the only remaining triable issue of fact in connection with Hopkins' entitlement to rescission under Counts II, III and V is whether Hopkins moved too slowly in its quest for rescission. But Hopkins' complaint leaves presently open the opportunity for Hopkins to pursue the road toward damages under all counts other than Count I, as well as to tread the avenue of rescission under at least a number of those counts. And

the ultimate factual determination of whether Hopkins moved with sufficient speed to avoid the Section 13 bar to success under 12(2) and/or to meet the *Baumel* standards for rescission under 10b–3, 10b–5 and 17(a), and perhaps under one or more of the other counts, requires subsidiary factual determinations which are material and relevant in the determination of the amount of damages Hopkins is entitled to be awarded under any count other than Count I. In the light of this Court's within holding that Hutton's liability under 10b–3, 10b–5 and 17(a) is established in this case's current summary judgment posture, Hopkins has the opportunity to seek damages rather than rescission, or damages in the event rescission is held unavailable to it. In either instance, while Hopkins is entitled to a judgment for damages under those three counts, Hutton is entitled to a jury trial in connection with the determination of the *amount* of any such judgment, and, under *Beacon Theatres* and *Dairy Queen,* is also entitled not to have facts, material and relevant in such jury trial on the issue of damages, found in any prior non-jury trial on the Section 13 and/or *Baumel* lack-of-speed questions.

At the conclusion of any non-jury trial on the Section 13 and/or the *Baumel* right-to-rescission issues, the findings of fact by this Court pursuant to Federal Civil Rule 52(a) with regard to whether Hopkins had knowledge, or should have discovered, LaPiere's misrepresentations or omissions at any given date after March 1, 1961, would be material and relevant in connection with Hopkins' proof of damages causally related to LaPiere's misrepresentations and omissions. Thus, if Hopkins should

---

which the common law recognized among its old and settled proceedings, but suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered. * * In a just sense, the amendment then may well be construed to embrace all suits, which are not of equity and ad-

miralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights." Parsons v. Bedford, Breedlove & Robeson, 28 U.S. (3 Pet.) 433, 447, 7 L.Ed. 732, 737 (1830). [Emphasis in original.] *Cf.* Mr. Justice White's majority opinion in Katchen v. Landy, 382 U.S. 323, 336 et seq., 86 S.Ct. 467, 15 L.Ed.2d 391 (1966).

be granted a non-jury trial on either the Section 13 or the *Baumel* rescission issue, and should be held not entitled to rescission, then certain findings in that non-jury trial might deprive Hutton, in the subsequent trial on damages under any count other than Count I, of Hutton's right to have a jury write upon a clean slate in connection with all facts relating to damages other than those indisputably established in a summary judgment context prior to trial. *Cf*. West v. Devitt, 311 F.2d 787, 788 (8th Cir. 1963).

In Beacon Theatres v. Westover, *supra*, plaintiff sought declaratory relief, and also an injunction prohibiting defendant from proceeding against plaintiff under the federal antitrust laws, pending final resolution of the controversy. Defendant, *inter alia*, counterclaimed against plaintiff for damages for violation of those laws and asked for a jury trial. The grant of the equitable relief sought by plaintiff would apparently have precluded defendant from pursuing its legal claim. The Supreme Court held that the defendant was entitled to a jury trial of any factual issues common to both the plaintiff's claim and the defendant's counterclaim. In Dairy Queen v. Wood, *supra*, plaintiffs, alleging breach of contract and/or trademark infringement, sought, *inter alia*, to enjoin defendant from using the plaintiffs' mark and also asked for a monetary judgment. The Supreme Court held that the defendant was entitled to a jury trial. A holding that plaintiffs were not entitled to any equitable relief might have barred plaintiffs' obtention of a judgment for a sum of money, but it is also possible that plaintiffs therein could have been held not entitled to the aid of equity and yet entitled to a monetary award. Exactly that situation exists in this case, just as it does, for example, when a plaintiff primarily seeks specific performance of a contract and only secondarily damages if specific performance is unavailable. *Beacon Theatres* and *Dairy Queen* require that in such situations there be one trial of the common fact issues, and that that trial be to a jury if a jury is demanded by either party. C. Wright, Law of Federal Courts § 92 (2d ed. 1970).

Accordingly, Hopkins' motion to strike Hutton's demand for a jury trial under the 12(2) count is hereby denied. Hopkins is hereby required to inform this Court and Hutton within fourteen (14) days from the date of this opinion (a) whether Hopkins is primarily seeking rescission under one or more of Counts I, II, III and V and/or any other count, and, secondarily, damages under one or more of Counts II–VII, inclusive, only if Hopkins is held not entitled to rescission under any count; or (b) whether Hopkins desires to opt for damages and forego its quest for rescission; or (c) whether Hopkins asks that the pending discovery and evidentiary questions,[18] all of which apparently pertain entirely to damages, be determined by this Court before Hopkins makes the election posed by (a) and (b). After receiving Hopkins' response, and affording to Hutton the opportunity for comment thereon, this Court will calendar further proceedings with regard to the possibility of the submission of special jury questions, of the order of trial, and of this Court's issuing a certification for interlocutory appeal under 28 U.S.C. § 1292(b) if either Hopkins or Hutton so requests.

It is so ordered.

18. See n. 5, *supra*.