The **JOHNS HOPKINS UNIVERSITY**

v.

James M. **HUTTON**, Jr., et al.

Civ. No. **15098.**

United States District Court, D. Maryland.

March 29, 1972.

John Henry Lewin, Edmund P. Dandridge, Jr., and Venable, Baetjer & Howard, Baltimore, Md., for plaintiff.

John A. Wilson, Michael J. DeSantis, and Sherman & Sterling, New York City, and John F. King, Baltimore, Md., for defendants.

FRANK A. KAUFMAN, District Judge.

Hopkins, following the earlier opinions of the United States Court of Appeals for the Fourth Circuit[1] and of this Court,[2] seeks, under three counts [2A] of its seven-count complaint, summary judgment, in the form of rescission. In its last opinion, this Court, noting (at 326 F.Supp. 250, 252) that at that time, Hopkins sought summary judgment under those three counts, as to liability only, granted (at 326 F.Supp. 250, 261) summary judgment under those three counts as to liability only, and required (at 326 F.Supp. 250, 265) Hopkins to inform this Court and Hutton "(a) whether Hopkins is primarily seeking rescission under one or more of Counts I, II, III and V and/or any other count, and, secondarily, damages under one or more of Counts II–VII, inclusive, only if Hopkins is held not entitled to rescission under any count; or (b) whether Hopkins desires to opt for damages and forego its quest for rescission; or (c) whether Hopkins asks that the pending discovery and evidentiary questions, all of which apparently pertain entirely to damages, be determined by this Court before Hopkins makes the election posed by (a) and (b)." (Footnote omitted.) Hopkins responded[3] by stating that it was "primarily seeking rescission under Counts II, III and V of the Complaint; secondarily, rescission under Count I; and damages under Counts II, III and V only if Hopkins is not entitled to rescission under Counts I, II, III or V."

Hopkins also filed a motion for summary judgment, as to rescission, under Counts II, III and V, and requested this Court to reconsider two of the determinations stated in its opinion filed in 326 F.Supp. 250, namely—

    I.  So long as Hopkins has not waived its right to seek damages in the

1. Hopkins v. Hutton, 422 F.2d 1124 (4th Cir. 1970), in which (at 1132) the Fourth Circuit held that "germane issues of material fact preclude[d] the entry of summary judgment," under the first of seven counts of the complaint filed herein by Hopkins under § 12(2) of the Securities Act of 1933, "on the issue raised by Hutton's limitations plea," under § 13 of that Act, but that "[o]n all other issues, the district court correctly entered summary judgment for Hopkins" in connection with the said 12(2) count.

2. Hopkins v. Hutton, 326 F.Supp. 250 (D. Md.1971) ; 297 F.Supp. 1165 (D.Md. 1968) ; 40 F.R.D. 338 (D.Md.1966) (Thomsen, C.J.).

2A. Counts II, III and V.

3. In a letter to this Court dated April 20, 1971.

event it is held not entitled to rescission under Counts II, III and V, or under Count I, Hutton is entitled to a jury trial of any triable fact issue under (a) Count I with regard to whether Hopkins has met its burden under Section 13 of the 1933 Act and/or (b) Counts II, III and V with regard to whether Hopkins is entitled to rescind rather than being limited to relief in the form of damages.

II. "Hopkins is * * * not entitled to the summary grant of relief in the form of rescission under Counts II, III or V. To gain that result, Hopkins must succeed at trial in establishing by the preponderance of the evidence that it demanded rescission 'within a reasonable time after discovery of the ground for rescission,'" Baumel v. Rosen, 412 F.2d 571, 574 (4th Cir. 1969), cert. denied, 396 U.S. 1037, 90 S.Ct. 681, 24 L.Ed.2d 681 (1970).[3a]

### I.

▊▊ This Court reaffirms its earlier stated conclusion that Hutton, having timely demanded a jury trial, is entitled to a jury trial in connection with *any and all triable fact issues* with regard to whether Hopkins is entitled to rescission (a) under Counts II, III and V in which Hopkins seeks relief pursuant to Section 10(b) of the Securities and Exchange Act of 1934 and Rules 10b–3 and 10b–5 promulgated thereunder, and also pursuant to Section 17 (a) of the Securities Act of 1933, and/or (b) under Count I in which Hopkins seeks relief under Section 12(2) of the Securities Act of 1933, *so long as* Hopkins continues to hold in reserve, in the event Hopkins is held not entitled to rescission, its claim for damages under one or more of Counts II–VII, inclusive, of Hopkins' complaint.

The factual context in which this issue is posed has been set forth by this Court in its last opinion and discussed therein (particularly commencing at 326 F.Supp. 250, 261 and 262, under the respective headings "Nature of Relief" and "Jury"), and need not be repeated herein. In essence, Hopkins contends that—

(1) all facts relative to its entitlement to rescission under Counts II, III and V are confined to the period between November 1, 1962 and November 1, 1963,[4] because a subjective as opposed to an objective test should be applied in measuring whether Hopkins moved with sufficient speed to permit rescission, and because this Court has already determined (at 297 F.Supp. 1165, 1224; see Judge Butzner's comment at 422 F. 2d 1124, 1130) that Hopkins did not have actual knowledge of Hutton's fraud before November 1, 1962; and

(2) all facts relative to whether Hopkins has met its Section 13 [5] burden under Count I are confined to the period subsequent to March 1, 1961 and preceding November 1, 1962, the latter date being one year prior to the date Hopkins filed this suit; and

(3) all facts relative to the amount of damages Hopkins is entitled to under Counts II, III and V, or any other counts,[6] are confined to the period preceding March 2, 1961, the day after Hop-

---

3a. 326 F.Supp. *supra* at 262. The factual and legal background of this opinion is set forth in the Fourth Circuit's opinion and in the prior opinions of this Court, and is not repeated or summarized herein except to the extent necessary in connection with reconsideration of those two issues.

4. The date Hopkins filed the within suit.

5. See n. 1 *supra*.

6. Assuming (a) this Court is correct in its grant of summary judgment, as to liability, under those three counts, or (b) Hopkins is otherwise successful in obtaining a verdict as to liability in this case. This Court has previously held that under Count I, Hopkins is entitled only to rescission, not to damages. 297 F.Supp. 1165, 1226. That holding was noted by Judge Butzner. 422 F.2d 1124, 1131 n. 8, 4 Cir.

kins purchased the Trice production payment. Hopkins has waived any right it may have to damages in connection with any expenditures Hopkins may have made after March 1, 1961 in an effort to reduce its damages. Also, Hutton and Hopkins are in agreement that damages should be determined as of March 1, 1961. But Hutton contends that certain post-March 1, 1961 developments relating to the production payment Hopkins purchased on that date are relevant and material to the determination of Hopkins' out-of-pocket damages on that date.[7] And Hutton also contends that, insofar as the Section 13 issue is concerned, Hutton is entitled to have the factfinder consider occurrences antedating March 1, 1961 as well as those which took place between March 1, 1961 and November 1, 1962 and that insofar as entitlement to rescissionary relief under the 10b–3, 10b–5 and Section 17 counts is concerned, Hutton is entitled to have the factfinder consider not only facts occurring after November 1, 1962 but also those occurring not only prior thereto but also prior to March 1, 1961. Indeed, in all three factual contexts—those relating to damages under any count, those relating to Section 13 issues under Count I, and those relating to rescission under Counts II, III and V, Hutton contends that all relevant events, whenever they occurred, should be considered.

In granting summary judgment under the 12(2) count, this Court made 126 separate findings of fact, 297 F.Supp. 1165, 1178–1197. Those summary findings were apparently approved by the Fourth Circuit. 422 F.2d 1124, 1126. Thus, those factual findings, made in the partial summary judgment setting of Federal Civil Rule 56, provide the factual underpinning for any trial which is hereafter held in this case on any issue. But they do not preclude Hutton—or Hopkins—during any such trial, from introducing evidence with regard to any relevant fact, whenever it occurred, not determined prior to such trial either by this Court under Rule 56, or by stipulation between the parties, or by admission or other appropriate discovery procedure. Accordingly, if this Court should accede to Hopkins' request and should try, without a jury, any issues pertaining to Hopkins' entitlement to rescission under the 10b–3, 10b–5 and Section 17 counts or under the Section 12(2) count, this Court, as it has earlier stated at 326 F.Supp. 250, 262 and ff., might well be placed in a position in which, pursuant to the requirements of Federal Civil Rule 52(a), it would be required to make one or more findings of fact (relating to the periods prior to March 1, 1961, between March 1, 1961 and November 1, 1962, and between November 1, 1962 and November 1, 1963) which might, in the event of a subsequent jury trial on the issue of damages, be relevant and material therein. That possibility, as this Court understands the spirit, if not the letter, of Dairy Queen v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), and its progeny, precludes this Court from first trying, non-jury, any factual issues relating to rescission under (a) Counts II, III and V, or (b) the Section 13 limitations issue under Count I. While the ultimate factual issues with regard to those rescission questions on the one hand, and the damage questions on the other hand, can perhaps be tightly compartmentalized into different periods, the underlying subsidiary factual determinations cannot be so neatly sliced and severed—at least not with any predictable certainty. They, like murder, will or, in any event, may "out"—in their case, from the isolated time periods into which Hopkins seeks to seal them in advance of trial. In that light, this Court reads Dairy Queen and the post-Dairy Queen opinions cited in 326 F. Supp. 250, 263, as teaching that Hutton is entitled to a jury trial of the rescission issues under Counts I, II, III and V so long as Hopkins holds in reserve

7. This Court has determined that the out-of-pocket standard applies in this case, 326 F.Supp. 250, 262.

its claim for damages under any count, since Hutton, in connection with any damage claim by Hopkins is concededly entitled to a jury trial. And this is true even if the issues which are open in this case with regard to rescission under any count, relate not to rights, but only to a specific type of equitable remedy, i. e., rescission. In that connection, this Court is cognizant of the implication of Mr. Justice White's quotation from Parsons v. Bedford, 3 Pet. 433, 447, 7 L.Ed. 732 (1830), in Ross v. Bernhard, 396 U.S. 531, 533, 90 S.Ct. 733, 735, 24 L.Ed. 2d 729 (1970),[8] that a jury trial is available "not merely [in] suits, which the common law recognized * * * but [also in] suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered . . . . " (Emphasis supplied by Mr. Justice White in Ross v. Bernhard, *supra*.) In this case, if this Court is correct in its grant of summary judgment as to liability under Counts II, III and V, and its holding that in the factual context of this case rescission is the *only* remedy available under Count I, the only possible triable fact issues left open in connecton with rescission as opposed to damages are related to the *remedy* of rescission, which, *in this case*, for reasons set forth in 326 F.Supp. 250, this Court believes is available only in equity. Perhaps, even so, Ross v. Bernhard entitles Hutton to a jury trial of the issues relating to rescission under Counts I, II, III and/or V, but, on balance, this Court would not think so. Nevertheless, because of the more than minimal possibility that there are common facts relevant and material to the factual determinations involved in connection with the damage questions on the one hand, and the rescission questions on the other hand, this Court, applying its understanding of *Dairy Queen* and its progeny, concludes that Hutton is entitled to a jury trial of the rescission issues if they are tried before or at the same time as the damage issues. But for reasons stated under II, *infra,* this Court also concludes that upon the current state of the record in this case and the undisputed facts disclosed by it, Hopkins is entitled to the summary grant of rescissionary relief under Counts II, III and V, and that Hutton, having failed within the context of Federal Civil Rule 56 to controvert those facts, is not entitled to wait until trial by jury to produce evidence in connection therewith.

## II.

In its opinion at 326 F.Supp. 250, this Court assumed, after consideration of the statements made by Judge Bryan in Baumel v. Rosen, 412 F.2d 571 (4th Cir. 1969), cert. denied, 396 U.S. 1037, 90 S.Ct. 681, 24 L.Ed.2d 681 (1970), that Judge Bryan's holding in that case required Hopkins to shoulder substantially the same factual burden in its quest for rescission under the 10b–3, 10b–5 and Section 17 counts as is imposed on it by Section 13 under the Section 12(2) count. At the time this Court so concluded, Hopkins had moved under the 10(b) and 17 counts for summary judgment only as to liability. As a Monday morning quarterback, this Court would, if it could, turn the clock back several years to the date before it rendered any opinion in this case, and require Hopkins to file at one time all summary judgment motions under all counts. Further, this Court suspects that Hopkins, given such a hindsight chance, would voluntarily so do. But, against the backdrop of events as they have in fact occurred[9] and in the light

8. Quoted more fully at 326 F.Supp. 250, 263 n. 17.

9. The progress of this case, since the Fourth Circuit's remand in 422 F.2d 1124, is detailed not only in 326 F.Supp. 250, but also in the correspondence among Court and counsel and memoranda filed by counsel, all of which are included in the official court file. So are the transcripts of all motion hearings which have been held in open court on the record.

of the present availability of additional affidavits and discovery supplied and undertaken and filed herein by both parties since this Court filed its last opinion on April 12, 1971 and the lengthy and indeed exhaustive briefs and oral presentations submitted by counsel on both sides since that date, this Court concludes that the burden imposed on a plaintiff like Hopkins who, if this Court's holding at 326 F.Supp. 250 is correct, is entitled to relief as to liability under the counts laid in 10b–3, 10b–5 and Section 17 contexts and who seeks to obtain that relief in the form of rescission, is different with regard to establishing entitlement to that form of relief, from that imposed on such a plaintiff in connection with relief sought under Section 12(2) and the latter's related Section 13 requirement.

Section 12(2) places the burden of *dis*proving his own *scienter* upon the defendant, 297 F.Supp. 1165, 1219, but requires the plaintiff affirmatively to prove, pursuant to Section 13, that plaintiff has instituted its suit within three years after the sale of the security and also "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence \* \* \*." (Section 13 of the 1933 Act, 15 U.S.C. § 77m). By contrast, Section 10(b) of the 1934 Act (and Rules 10b–3 and 10b–5 thereunder) and Section 17 of the 1933 Act, place the burden of proving the *scienter* of the defendant upon the plaintiff. And the applicable case law teaches that in this suit instituted in 1963 in the District of Maryland the limitations period under the counts stated under Section 10(b) of the 1934 Act, in the absence of any specific limitations period having been imposed by the federal Congress with regard to 10(b) actions in the 1934 Act or any other federal statute, is the three-year limitations period applicable in Maryland prior to 1968 in connection with the most closely related Maryland tort actions. See Batchelor v. Legg & Co., 52 F.R.D. 553, 558 (D.Md.

1971). The same, in the absence of any provision in the 1933 Act or in any other federal statute, would appear true with regard to the Section 17 count. Sackett v. Beaman, 399 F.2d 884, 890 (9th Cir. 1968); Turner v. Lundquist, 377 F.2d 44, 46 (9th Cir. 1967); Saylor v. Lindsley, 302 F.Supp. 1174, 1179 (S.D.N.Y.1969).

The Fourth Circuit has already held, with regard to the three-year requirement of Section 13, that this case was brought by Hopkins within such three-year limitations period. 422 F.2d 1124, 1130. That holding is equally applicable to the 10b–3, 10b–5 and Section 17 counts. Thus, there is no question of limitations constituting a bar with regard to any of those three counts. Rather, there remains for determination herein only the question of whether Hopkins is entitled to relief in the form of rescission under one or more or all of those three counts.

Hutton, relying heavily upon Baumel v. Rosen, *supra,* certain of the positions urged and statements made in Friedman, Delay as a, Bar to Rescission, 26 Cornell L.Q. 426 (1941)—an article cited by Judge Bryan in *Baumel*—and this Court's expressions of view in 326 F. Supp. 250, contends that a plaintiff, in order to be entitled to rescind in a 10(b) or 17 suit, has the burden of affirmatively alleging and proving that (1) it has taken all steps which a reasonable man should have taken to discover the defendant's fraud and that (2) it has demanded rescission promptly after it knew or should have known thereof. Since the Fourth Circuit has held, on the basis of the record before it in 1970, with regard to Hopkins' 12(2) count that there existed a triable issue of fact as to whether Hopkins instituted this suit within the one-year limitations period in accordance with the burdens and standards of Section 13, Hutton contends that *if* those same burdens and objective standards must be met by Hopkins to entitle it to rescissionary relief under any of the other counts, there exists in this case at this time a similar

triable issue of fact as to whether Hopkins had or should have had knowledge of Hutton's wrongdoing at a time sufficiently in advance of Hopkins' tender of the security on August 6, 1963 to disentitle it to rescind. In connection with Section 13, the key date is one year before the day suit herein was filed, namely, since this suit was filed on November 1, 1963, November 1, 1962, and the relevant period for examination is the period prior to that latter date. In connection with rescission under the 10 (b) and 17 counts, the key date is the date suit was instituted, i. e., November 1, 1963, and the relevant period occurs prior thereto. Thus, if there is a triable fact issue with regard to the former, *a fortiori,* there is one with regard to the latter unless (a) the applicable standards or burdens differ, and/or (b) the record currently before this Court is not the same as the record before this Court in 1968 and the Fourth Circuit in 1970.

The starting point of the analysis of those applicable burdens and standards is Baumel v. Rosen, *supra.* The facts of that case reveal that in 1957, shortly after Gulf American Land Company (hereinafter referred to as Gulf American or Gulf) was incorporated as a Florida corporation and began to deal in real estate and related businesses in Florida and elsewhere, the two Rosen brothers each purchased 26%, or a total of 52%, of the stock of that corporation and made loans to it. Also, in 1957, the

company sold stock to others, including Baumel and Weiner (the plaintiffs-appellees in *Baumel*). In 1959, the Rosens, while in control and while exercising direction of the company, bought the stock of Baumel and Weiner. Judge Bryan noted (at 573) that the court below had "found that the purchases from Baumel and Weiner, as well as from others, were procured through affirmative misrepresentations of the financial condition of the company, and under nondisclosure of material incidents in the corporate operations," and had correctly held the Rosens liable. However, Judge Bryan, speaking for a unanimous three-judge panel, reversed the grant of rescission by the district court. In so reversing, Judge Bryan summarized the relevant facts as follows (412 F.2d at 574):

> On August 16, 1962, Baumel and Weiner renounced their sales to the Rosens by filing these actions. The complaint in each instance asked for rescission, and for restitution by delivery to the plaintiffs of the current equivalent in kind of the 500 shares purchased by the defendants in 1959. In the interim, the Gulf stock was split on March 1, 1961 at the rate of 34.6 shares for 1, giving 17,300 shares for each 500-unit. Another split occurred on March 19, 1962, at the rate of 4 to 1. At the time of suit each initial unit had thus increased to 69,200 shares.[10]

    \*    \*    \*    \*    \*    \*

10. In a brief herein, Hopkins, relying upon the facts jointly stated by both sides during the appeal in *Baumel*, has summarized the market value fluctuations of Gulf American stock in 1961 and 1962 as follows:

"Shortly before the March 1961 public offering, Gulf American split its common stock 34.6 for 1 and shortly before the 1962 public offering the stock was further split 4 for 1. Thus, the "unit" of 500 shares of stock originally acquired by Baumel was by July, 1962 represented by 69,200 shares. Adjusting all prices to reflect both the first and the second stock splits, Baumel in 1957 paid 1.451 cents a share for the stock; in August,

1959 his stock was sold by him to the Rosens for about 14½ cents a share. All other sales of Gulf American stock made during the spring or the summer of 1959 were at prices of 14½ cents a share *or less.* A year and a half later, on March 8, 1961, the offering price was $1¼ a share. In March, 1961, the high was 2¼ and its low was 1$^{11}$/₁₆. In June, 1961, the stock was listed on the American Stock Exchange. It reached 12$^{19}$/₃₂ in November, 1961, dropped to 7$^{25}$/₃₂ in December, 1961, attained a peak of 15¾ in March, 1962, and went down to 7⅞ in July, 1962, a month before suit was filed (Joint App. in *Baumel* case p. 697)."

\* \* \* Plaintiffs sold their stock [to the Rosens] in August 1959. Baumel states that at the end of the month or in early September he believed he had been "taken", i. e., that the price he received was far less than the then value of the securities. Weiner testifies that at Thanksgiving or Christmas 1959 he had been told by a friend that Gulf "had plans to go public and that the stock was worth quite a bit of money more than I had received for it".

Nevertheless, neither plaintiff renounced for three years—in August 1962 when they instituted these actions. Rescission is a radical move, and the law exacts the election of that course to be asserted without wait. The demand is that advice of the determination be given within a reasonable time after discovery of the ground for rescission.

This principle is stringently administered. Reasonable time is inceptive from the receipt by the rescinder of word putting him on notice. It is then incumbent upon him to pick up the scent and nose to the source. See Friedman, Delay As a Bar to Rescission, 26 Cornell Law Quarterly 426, 432, text at *footnote 31* and authorities cited therein (April 1941). If the quest confirms the suspicion, then he must make decision with reasonable dispatch. Failing this, entitlement to rescission disappears.

Here, no such vigor was exhibited. Indeed, although plaintiffs are not chargeable with complete awareness of the knavery earlier than March 1961—

when the Gulf stock went public, and more than 14 months after they had wind of the malodor—they pondered another 18 months before disclaiming the sale. [Emphasis supplied.]

Footnote 31 in the Friedman article contains citations in support of the following statement made by the author in the text (at p. 432):

Full and complete knowledge of an alleged fraud or breach of contract is not essential to impose upon a would-be rescinder the necessity of acting promptly and diligently if he wishes to assert a rescission. It is enough that he has such *notice of the facts* as would *impel* a reasonable man in his position to make inquiry. [Emphasis supplied.]

In *Baumel*, the would-be rescinders, with knowledge of the fraud, delayed for a lengthy period in seeking rescission and thus, during that period, speculated while the value of the stock fluctuated greatly, and "pondered" eighteen (18) months, using Judge Bryan's word (412 F.2d at 574), whether to disclaim the sale. In the within case, the record contains no evidence of—and Hutton has not even affirmatively suggested—any speculation by Hopkins or any fluctuation in the market price of the production payment Hopkins purchased from Trice on March 1, 1961 or of any reasonable anticipation by Hopkins in advance of, or during, that period that any such fluctuation would occur.[11] In *Baumel*, the purchasers delayed in tendering back and in seeking rescission long after they knew of the fraud. In this case, the

---

11. Hopkins has filed in this case an affidavit of J. J. Arps, a petroleum engineer employed by Hopkins to make a study of the March 1, 1961 production payment Hopkins purchased from Trice. Arps rendered his report to Hopkins in 1967. Arps, who states that he was engaged in the period from December 1, 1962 to August, 1963 in evaluating oil and gas properties in the United States and is qualified as an expert to form an opinion with regard to market value fluctuations of such production payments during that period of time, concluded that no pronounced changes or fluctuations in the market value of the March 1, 1961 production payment took place in that period or could reasonably have been anticipated or forecast to occur during that period. Hutton challenges the Arps affidavit as speculative and as, in any event, not entitled to weight in a Rule 56 context. This Court, in the current context of this case and in reaching its conclusion herein, disregards and affords no weight to the Arps affidavit.

*current* state of the record discloses no such delay by Hopkins.

In its earlier opinions, at 297 F.Supp. 1165, 1224 n. 33, and 326 F.Supp. 250, 261, this Court, lacking any information as to any earlier tender date, proceeded on the assumption that Hopkins may not have tendered back to Hutton the oil production payment, purchased by Hopkins on March 1, 1961, prior to November 1, 1963. As an exhibit to an affidavit of Henry Baker, Treasurer and Financial Vice President of Hopkins during the entire 1960–1963 period, Hopkins has filed, since this Court rendered its opinion in·326 F.Supp. 250, a copy of a draft of a five-count bill of complaint, alleging substantially the facts set forth by Hopkins in the complaint filed herein on November 1, 1963. It is undisputed that a copy of that draft was handed in the presence of Baker and Patterson, Hopkins' Assistant Treasurer, by Dandridge, Hopkins' counsel, to two of Hutton's partners, its then oil and gas department manager and its counsel, DeSantis, in Hutton's offices in New York City on August 6, 1963. While the accounts of that meeting set forth in opposing affidavits, also filed since this Court's last opinion, disclose some disagreement as to what was said during that meeting, it is not disputed by Hutton that Hopkins' representatives handed to Hutton's representatives at that meeting the aforesaid draft of the bill of complaint, or that in that draft Hopkins, at the end of the first count, alleges "acts and omissions" under Section 12(2) of the '33 Act and alleges that it "has heretofore tendered to Defendants who refused said tender," the oil production payment Hopkins purchased on March 1, 1961, and recites that "[p]laintiff hereby renews said tender * * *."

The following facts, *inter alia,* have also been developed since this Court filed its last opinion and are also undisputed: [12]

(1) The aforesaid August 6, 1963 meeting resulted from Baker's request for such a meeting during a telephone call Baker initiated to Iglehart, a former Hutton partner, on July 26, 1963.

(2) The day after the August 6, 1963 meeting Dandridge addressed a letter to DeSantis to which the latter responded on August 8, 1963, stating therein, *inter alia,* that he (DeSantis) would return from vacation on September 10, 1963. After correspondence between Dandridge and one of DeSantis' associates while DeSantis was on vaction, DeSantis, on September 16, 1963, wrote to Dandridge and the latter responded as follows on September 19, 1963:

I do not wish to press you unduly but, as you know, I feel that if we are to file suit we should do so before October 15; therefore, if we are to have any further conversations, they should take place within the very near future.

(3) On September 20, 1963, DeSantis, in a letter to Dandridge (acknowledging receipt of a November 1, 1962 report of William Bednar, employed as early as 1960 by Bankers Trust as a consultant in connection with Trice's oil production payments, 297 F.Supp. 1165, 1181, Finding of Fact 13), wrote:

I appreciate the urgency expressed by you in the last paragraph of your letter, and we shall make, and are making, every effort to comply with your request. However, in view of the *complexity of the matter to be investigated* and the substantial amount involved, it may be impossible for us to come to a decision before October 15, 1963. In such event, we may have to request a little more time beyond that date to reach a decision. [Emphasis supplied.]

12. This Court, as it similarly did in making all findings of fact in 297 F.Supp. 1165, disregards all facts affied by Baker in his May 3, 1971 affidavit which depend in any way upon Baker's credibility, unless those facts have been agreed to by or on behalf of Hutton in affidavits or other documents filed herein by Hutton.

(4) On September 24, 1963, Dandridge replied:

> As I believe you know, we are concerned with the passage of time only in two respects. In the first place I am afraid that the time may arrive when the District Court in Tyler [13] may require that we disclose the names of all persons against whom we wish to retain claims after confirmation of a Plan of Reorganization. We will not make any such disclosure unless we are forced to, but of course I cannot give any assurances as to when the Court might request this of us. In the second place I am concerned that if we do not file the suit shortly after the middle of October, we might encounter limitations problems. If we are to withhold filing of a suit more than a day or two after October 15, I would want an agreement from your clients that no defense will be raised based on failure to file the Complaint by October 15.

(5) On October 10, 1963, more than 150 days after Hutton's work product period began,[14] DeSantis wrote to Dandridge, stating counsel's opinion that Hutton had no liability to Hopkins and rejecting, on Hutton's behalf, Hopkins' claim.

Thus, the record discloses that Hopkins was not guilty of delay after July 26, 1963. Nor did Hopkins, as this Court, at 297 F.Supp. 1165, 1220–22, with the seeming approval of the Fourth Circuit, 422 F.2d 1124, 1130, has previously found, have any actual knowledge of defendant's wrongdoing until after November 1, 1962. Thus, it is necessary to examine the period between November 1, 1962 and July 26, 1963 and prior thereto to determine what Hopkins learned on its own, or from Hutton, and the period prior to July 26, 1963 and also prior to November 1, 1962 to ascertain what Hopkins, with the exercise of reasonable diligence, should have learned.

(6) On November 10, 1962, Bednar suggested in a preliminary report to Hopkins that the estimates of the reserves might have been either erroneous or not as represented to Hopkins before it made its investment. There is no indication in the voluminous record in this case that prior thereto Hopkins (a) had any earlier subjective knowledge that the reserves might be inadequate to protect Hopkins' investment, or (b) shut its eyes to any such information or to warnings flashed in front of it.

(7) Again, in December, 1962, Bednar expressed to Hopkins a further preliminary pessimistic view. And in December, 1962, and perhaps as early as November 28, 1962, Baker discussed with Dandridge the possibility of Hutton's liability to Hopkins. In January, 1963, Bednar gave information to Hopkins which led Baker and Dandridge to note at that time that the DeGoyler and MacNaughton (D and M) estimates differed substantially from the estimates represented in the February 3, 1961 brochure as the estimates of D and M. (See 297 F.Supp. 1165, 1190–1191; Findings of Fact Nos. 64 and 65). However, in January, 1963, Hopkins had before it a lot of work before it could discover who, if anyone, had done something wrong to Hopkins. By contrast, Baumel and Weiner knew, when they discovered they had been taken, who had wronged them.

(8) In February, 1963, Hopkins sent Bednar's report to Brown. Hopkins admits that at a meeting with Brown on March 18, 1963, Brown informed Hopkins that LaPiere, an old friend of Brown, had employed Brown at Hutton's expense to make his 1961 study for Hutton and Trice and not for Hopkins, and that he (Brown) had not studied the reports of D and M or of any of the other engineers. Thus, Hopkins, by mid-March, 1963, not only was the recipient of Bednar's pessimism with regard to the reserves and of the discrepancies with regard to the D and M estimates, but also knew that Brown had not acted in 1961 as Hopkins' independent expert consultant. Approximately one hundred

---

13. In connection with Trice's bankruptcy.

14. See n. 17, *infra.*

and thirty days later, Baker, on July 26, 1963, asked for the meeting which took place on August 6, 1963, and at which Dandridge handed the draft complaint to Hutton's representatives. Hopkins contends that it required that period of time for it and its counsel to examine documents and records, interview witnesses, research legal authorities, determine the likelihood of loss, and attend to the problems caused by Trice's reorganization. That contention would appear completely reasonable.

(9) Iglehart, a former Hutton partner, has stated that in a telephone conversation on May 29, 1963, he told Baker that "Hutton wanted to do whatever was right" and that Hutton did not want to keep any commission it had earned in the transaction.[15] Iglehart has also affied that when he talked to Baker on May 29, 1963 he did not "have any information or knowledge that LaPiere was guilty of any misconduct in his relations with Hutton or with Trice."[16]

(10) William Hutton has stated that in May, 1963, his company's information concerning purported payments by Trice to LaPiere was too indefinite and too incomplete for Hutton to pass it on to Hopkins, that Hutton continued to explore into the Trice situation in the May-July, 1963 period; that when Hutton's counsel, DeSantis, interviewed LaPiere on July 9, 1963, the latter denied any impropriety in his relations with Trice (DeSantis noted, however, that LaPiere was "greatly embarrassed" and "very much disturbed" by the information with which DeSantis confronted him, including details of purchases made by Trice for LaPiere and commissions paid by Trice to LaPiere);[17] and that, as of July, 1963, Hutton did not have "any *concrete evidence* to present to Hopkins that LaPiere had been secretly in the pay of Trice during the period of Hopkins' negotiations for the purchase of the production payment."[18] (Emphasis in original.)

A review of the massive record in this case, compiled since 1963 and comprising considerably in excess of 7500 pages of testimony and factual documents, reveals the accuracy of DeSantis' use in September, 1963 of the word "complexity." The fact that Hopkins needed from November 1, 1962 until July 26, 1963 to investigate, to sift and to determine whether to level a very serious charge against such a highly reputable financial firm as Hutton, particularly in view of the close associations of certain of Hutton partners and representatives, on the one hand, and some of Hopkins' officers and representatives, on the other hand, in no way gives rise to any inference of (a) subjective knowledge by Hopkins of Hutton's wrongdoing at any date substantially before July, 1963, or (b) Hopkins' closing of its eyes to any such knowledge, or (c) any delay by Hopkins, purposeful or otherwise; nor does it provide any basis for a factual determination that on objective standards, Hopkins should have discovered Hutton's wrongdoing before July 26, 1963. Rather, the record discloses only that Hopkins was careful not to claim against Hutton until after adequate investigation.

In the Fourth Circuit's opinion herein, 422 F.2d 1124, 1130-1131, Judge Butzner observed:

Before November 1, 1962 Hopkins learned that Trice was in financial trouble, that some of its checks were returned for insufficient funds, that Trice's report of its financial condition could not be reconciled with Dun & Bradstreet's, that the return from another production payment was behind schedule, that some of the wells under-

---

15. Iglehart's June 4, 1971 affidavit, p. 2.

16. Iglehart's June 4, 1971 affidavit, p. 2.

17. DeSantis' memorandum of his interview with LaPiere on July 9, 1963, furnished to Hopkins as part of Hopkins' discovery in this case. Hutton's work product period

was determined by this Court (Chief Judge Thomsen) to begin as of May 9, 1963; and that of Hopkins as of December 14, 1962.

18. William Hutton's affidavit, p. 5, ¶ 10, filed herein on June 11, 1971.

lying Hopkins' payment were not producing or were underproducing, and that an involuntary petition for bankruptcy had been filed against Trice.

To be sure, Hopkins and its advisers did not stand idly by as this bad news rolled in. They conducted investigations that led them to believe that Trice's troubles, and Hopkins' own worries, were caused by factors other than deficiencies in the estimates of the future net revenue. * * *

Perhaps, as Hopkins argues, Trice's shaky financial condition would not alert an investor to fraud. But surely the failure of some wells to produce as scheduled coupled with Trice's lack of candor about its finances *might cause a reasonably diligent investor to probe the data upon which he based his purchase*. Had Hopkins compared all the experts' reports, which it had a right to do under the terms of the production payment, it could readily have discovered the untrue statements and the omissions about which it now complains. [Emphasis supplied.]

Judge Butzner so wrote in the light of the record then existing in this case and in the context of applying the requirements of Section 13. As of the date of this writing, the record, as has been indicated *supra*, has been substantially amplified. In addition, as above indicated, the duty to inspect—to ferret out if you will—which Judge Butzner discusses in connection with Section 13 would not appear to impose upon Hopkins in a 10(b) or 17 action the duty to do anymore than it did during the first seven months of 1963 and prior thereto. Whether Hopkins can be said, in the light of the additions to the record since Judge Butzner wrote in 422 F.2d 1124, to have satisfied the standards of Section 13 and to be entitled to summary rescissionary relief under 12(2) poses an issue not presently before this Court though in this opinion this Court assumes, *arguendo*, that the answer to that

question is in the negative. Herein, the inquiry narrows to the determination and the recognition of those factors which qualify or disqualify a person to or from entitlement to rescission in a 10(b) or 17 action. What must such a person, who has been wronged, do or not do if he desires to rescind, both before and when he files such a suit? To begin with, he must not sit still and delay filing his suit after he has knowledge of the wrongdoing, particularly if, by so doing, he desires to engage in, or in fact engages in, speculation.[18a] Friedman, in his article, wrote (at 451):

> An attempt at speculation—that is, the retention of the fruits of the bargain, or the continued recognition of a contract as subsisting, done for a time with the purpose of seeing whether affirmance or disaffirmance would be more profitable—might properly be characterized as an actual ratification of the contract. The authorities uniformly condemn such speculation by a would-be rescinder. [Footnote omitted.]

Earlier in that article, Friedman (at 432–33), after quoting Black, Rescission and Cancellation § 540 (2d ed. 1929) as stating:

> . . . it is held that the purchaser of personal property is *bound*, within a reasonably short time after its delivery to him, to *make* a sufficient examination, *inspection*, or test of it to enable him to determine whether or not he has cause to complain of misrepresentations in regard to it, or of a deficiency in quantity or quality, or failure to correspond with samples or with a warranty" (emphasis supplied),

immediately hastened (at 433–34) to warn:

> This is an erroneous statement of the law, imposing a far stricter duty upon a rescinding party than is imposed by the cases. The cases cited in support of the statement stand only for

---

18a. There is no evidence in this case of any speculation by Hopkins. See the discussion at p. 14, *supra*.

the well-settled propositions that: (1) the rescinding party may not shut his eyes to the obvious facts showing misrepresentation or breach of contract, but will be held to have acquired that knowledge which would have been acquired through ordinary and reasonable diligence . . . .

But any suggestion that a defrauded party . . . has a *duty* to ascertain the facts has been repudiated by the authorities. It is only where notice of the facts has been brought to a would-be rescinder that he must act promptly in declaring his rescission. [Emphasis in original; footnotes omitted.]

The case law contains many illustrations of delaying or speculative tactics which have resulted in wronged plaintiffs being held not qualified to obtain rescissionary relief. Among such cases are three cited and discussed by Judge Bryan in *Baumel* (412 F.2d at 574–575), namely, McLean v. Clapp, 141 U.S. 429, 12 S.Ct. 29, 35 L.Ed. 804 (1891); Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 23 L.Ed. 328 (1875); and dictum in Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 303 F.2d 527 (10th Cir. 1962). In *McLean,* the defendant, by affirmative plea, successfully raised delay as a bar to rescission by the plaintiff—sought by the plaintiff after the latter had more than eleven years of knowledge of alleged fraud in connection with a mortgage foreclosure. In *Twin-Lick,* in which the defendant's sale as trustee under a deed of trust covering realty, given as security for a loan, was attacked as a violation of defendant's fiduciary obligation, the plaintiff waited four years to state the challenge—and was held not entitled to rescind. In both *McLean* and *Twin-Lick,* the fluctuating value of the property involved was stressed, as it was by Judge Bryan in *Baumel.* Indeed, the quotations (at 574) from *McLean* and *Twin-Lick,* selected by Judge Bryan, include the words "speculative" from *McLean* and "fluctuating" from *Twin-Lick.* It

is also to be noted that the cases cited in *Twin-Lick* disclose lengthy delay.

*Estate Counseling,* the third case relied upon by Judge Bryan in *Baumel,* contains strong dictum with regard to the need to act promptly to rescind when the transaction is one of "a speculative nature"—words which Judge Bryan also quoted in *Baumel.*

Nothing in *Baumel,* or in the cases it cites, or indeed in any of the cases cited or discussed in Friedman's article, is in any way inconsistent with the position set forth in Restatement of Restitution § 64 (1st ed. 1937):

§ 64. Delay in Avoidance of Transaction.

An unreasonable delay in manifesting an avoidance of a transaction after the *acquisition of knowledge* of the facts terminates the power of rescission for fraud or mistake, and the consequent right to restitution, if the interests of the transferee or of a third person are harmed or were likely to be harmed by such delay. [Emphasis supplied.]

But it is to be particularly noted that Comment (b) to that section states:

A person who has been defrauded is under no duty of diligence to ascertain the facts. He is not required to investigate statements of facts coming from unauthoritative sources. * * * [Emphasis supplied.]

Comment (c), with regard to the "Delay after Knowledge of Facts," states:

It is not possible to make a useful statement of exact rules which determine the situations in which promptness is required and the time within which an election must be made when it must be made promptly. The following considerations, however, are important. The degree of culpability of the transferee, if any, is of prime importance; less delay will be permitted against an innocent transferee than against one guilty of fraud or duress. Ordinarily, there is injustice

to the transferee in postponing election . . . where delay would give the transferor an unfair chance to profit without a corresponding risk of loss if he were to retain his power of election, as where the *transaction was speculative* . . . . [Emphasis supplied.] [19]

In Pence v. Langdon, 99 U.S. 578, 581, 25 L.Ed. 420 (1878), in which rescission of the purchase of mine stock was successfully sought, the Supreme Court, in rejecting the defenses of delay, waiver and acquiescence by the seller, said:

Acquiescence and waiver are always questions of fact. There can be neither without knowledge. The terms import this foundation for such action. One cannot *waive* or acquiesce in a wrong while ignorant that it has been committed. Current suspicion and rumor are not enough. There must be *knowledge* of *facts* which will enable the party to take effectual action. *Nothing short of this will do.* But he may not *wilfully* shut his eyes to what he might readily and ought to have known. When fully advised, he must decide and act with reasonable dispatch. He cannot rest until the rights of third persons are involved and the situation of the wrong-doer is materially changed. Under such circumstances he loses the right to rescind and must seek compensation in damages. But the *wrong-doer cannot* make *extreme vigilance* and *promptitude* conditions of rescissions. It does not lie in his mouth to complain of delay, unaccompanied by acts of ownership, and by which he has not been affected. The election to rescind or not to rescind, once made, is final and conclusive.

*The burden of proving knowledge of the fraud and the time of its discovery rests upon the defendant.* [Emphasis supplied].

*See,* to the same general effect, Libby v. L. J. Corporation, 101 U.S.App.D.C. 87, 247 F.2d 78, 82 (1957) (Burger, J.); Johnson v. Mansfield Hardwood Lumber Co., 159 F.Supp. 104, 105 (W.D.La. 1958), aff'd, 263 F.2d 748 (5th Cir.), cert. denied, 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 120 (1959); [20] McIver v. Nor-

19. *See also* Restatement of Contracts § 483 (1932) which provides:

§ 483. Loss of Power of Avoidance by Failure to Notify the Other Party.

(1) The power of avoidance for fraud or misrepresentation is lost if after acquiring knowledge thereof the injured party unreasonably delays manifesting to the other party his intention to avoid the transaction.

(2) In determining the unreasonableness of delay the following circumstances are influential:

(a) the speculative character of the contract whereby prolongation of the power to affirm or to avoid would give an advantage to the injured party or increase the loss of the other party;

(b) the likelihood that the party guilty of the fraud or misrepresentation will materially change his position, or the welfare of a third person be unjustly prejudiced by delay;

(c) the fact that change of position by the party guilty of the fraud or misrepresentation, or prejudice to a third person, has in fact occurred during a period of delay in manifestation of intention.

Comment a to Section 483 states, *inter alia,* that "the injured party . . . cannot lie by and delay choosing whether avoidance or affirmance will be more profitable, especially if the contract relates to a speculative transaction." And Illustration 1 to that section states:

A fraudulently induces B to enter into a contract in January by which A agrees to sell and B to buy one hundred shares of the C corporation on May 1st. B soon discovers the fraud but concludes to wait and see whether the market price of the shares rises or falls. In April he manifests an intention to avoid the transaction. The manifestation is inoperative, although A has not changed his position and the welfare of third persons has not been prejudiced.

20. In Johnson v. Mansfield Hardwood Lumber Co., *supra,* the District Court wrote (159 F.Supp. at 125):

Plaintiffs' counsel, as responsible, ethical members of the Bar, surely could not have been expected to file a suit based on fraud before they had obtained sufficient evidence in corroboration of their clients' version of the facts. This

man, 187 Or. 516, 213 P.2d 144 (Or. 1949). *See also* Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (9th Cir. 1962), 333 F.2d 568 (9th Cir. 1964), in which the Ninth Circuit stressed "the mental attitude of the actor" (333 F.2d *supra* at 571).

The language in Pence v. Langdon and in the Restatement of Restitution lends support to the view that a would-be rescinder need not affirmatively set out to discover and that he need only keep his eyes wide open and exercise reasonable alertness. There are, however, a number of cases, some cited by Friedman at p. 432, n. 31, which do perhaps impose an affirmative duty of inspection, in the context of an objective, reasonable-man standard, upon the would-be rescinder. *See, e. g.*, Bynum v. Southern Building & Loan Assn., 223 Ala. 392, 137 So. 21, 23 (1931), stating: "Our cases are to the effect that one electing to rescind a contract for fraud must exercise the right within a reasonable time, that is, with due promptitude from the time the fraud was discovered, or ought to have been discovered"; and Lasby v. Burgess, 88 Mont. 49, 289 Pac. 1028, 1032 (1930); "If the information was such as to put him [the plaintiff] on inquiry, which, if pursued, would result in knowledge, it is sufficient, although coming from a third person. Black on Rescission & Cancellation (2d Ed.) § 539 * * *." Nevertheless, in this Court's opinion, while the test may, at least to some degree, include elements which are objective as well as subjective, and may place some affirmative duty to

ferret out the wrongdoing and the wrongdoer upon the person who has himself been wronged, the view which seemingly controls in a case of this kind is the one set forth in Pence v. Langdon, in the Restatement of Restitution, and in Friedman, at 433–34 where the latter warned against imposing an overly strict duty of inspection upon the would-be rescinder.[20a]

The application of those standards to Hopkins' conduct in this case must be made not only with full regard of the burdens Hopkins bears in a summary judgment setting, but also of the differences between the burden of proof which Hopkins bears in a 10(b) or 17 action as opposed to a 12(2)–13 proceeding. The extent of Hopkins' duty to inspect and to ferret out the wrongdoing and the wrongdoer, and the speed with which the same should have been accomplished by Hopkins is quite different under 12 (2)–13 than under 10(b) or 17.[21] Section 13 specifically imposes upon a plaintiff the burden of proving that the plaintiff neither knew nor should have discovered the wrongdoing by the exercise of due diligence. By way of direct contrast, in a common law (or 10(b), or 17) setting, that burden is, as Pence v. Langdon, *supra*, specifically states at 99 U.S. 582, 25 L.Ed. 420, upon the defendant.[22] To the same effect with regard to the burden of proof being upon a defendant such as Hutton to show delay by a plaintiff such as Hopkins, *see* Reliance Life Ins. Co. v. Burgess, 112 F.2d 234, 237–238 (8th Cir. 1940); Black, Rescission and Cancellation, *supra* at 1481, 1621–22.[23] To the contrary at first blush, is

---

took time, but not too much time at that, for they had uncovered enough facts to justify their action herein, and filed the suit, *within less than a year from the first notice* plaintiffs received as to their having been defrauded. [Emphasis supplied.]

**20a.** Quoted at pp. 22–23 *supra*.

**21.** See the discussion *supra* beginning at pp. 21–22.

**22.** See the Pence v. Langdon quotation, *supra* 99 U.S. at p. 26, 25 L.Ed. 420.

**23.** Black therein wrote:

[I]f a prima facie right to rescind is made out, then the burden of proving acquiescence, waiver, or election to affirm is on the party alleging it. But it is said that where an original transaction is infected with fraud, a confirmation of it would be so inconsistent with justice, and so likely to be accompanied by imposition, that the courts will watch it with the utmost strictness and not allow it to stand but on the

Friedman who in his article (at 452 n. 117 and n. 118) cites ten state court cases to support his conclusion (at 428–29) that "in rescission actions, it is incumbent upon the plaintiff to prove that he acted promptly in seeking his rescission." [24] In some of those cases, special statutory requirements may well explain holdings or dicta. In others, the period of delay was lengthy, thus seemingly establishing a prima facie case of delay by the plaintiff which the latter did not or could not rebut. But, in any event, Friedman himself carefully qualified his views as to burden by adding (at 452–53):

> The rule would seem to be established that the burden is upon the rescinding party to show that he acted promptly in seeking rescission. The requirement of prompt action is usually made an element of the cause of action. *As a practical matter, however, the burden of moving forward with the evidence is usually shifted with great facility to the defending party.* A rescinding party who will admit that he discovered a fraud more than a week or two before making a tender is rare. Such admission might,

of course, mean an immediate dismissal of his cause of action. *The rescinding party's allegations and proof will probably show due diligence. It is then incumbent upon the defendant to show knowledge or notice of the facts at a date earlier than that admitted, and to establish unreasonable delay therefrom.* [Footnotes omitted; emphasis supplied.]

In McCormick on Evidence 672 (1954), the author sets forth a three-fold classification of (1) burden of pleading, (2) initial burden of producing evidence, and (3) burden of persuading the factfinder of the existence or nonexistence of the fact. Hopkins did not, in its complaint, or other than orally and conditionally in argument, seek rescission under the 10(b) and 17 counts until it was permitted by this Court to amend its complaint after this Court filed its opinion in 326 F.Supp. 250. After Hopkins so amended its complaint, this Court permitted Hutton to plead unreasonable delay and laches on the part of Hopkins without in any way waiving Hutton's primary position that Hopkins has the burden of alleging and proving Hopkins' own lack of knowledge. This

---

clearest evidence of a solemn and deliberate act. [p. 1481; footnotes omitted]

\* \* \* \* \*

\* \* \* But if the means of information were not accessible to the complainant, and he justifiably relied on what the defendant told him, the latter must prove knowledge on the part of the complainant, if he resists a suit for rescission on that ground. So, if the defendant in an action of this kind sets up the defense that the complainant had knowledge of the facts which would have entitled him to rescind, but nevertheless acquiesced in the contract or ratified it, the burden is not on the complainant to show his ignorance of such facts, but on the defendant to prove his knowledge of them. Laches of the complainant, debarring him from relief to which he otherwise would be entitled, is likewise a defense which casts the burden of proof on the defendant, except in cases where an unreasonable delay appears on the face of the pleadings, when the burden falls on the

plaintiff to show the time when he discovered the fraud or other ground of rescission, and also circumstances which explain or excuse his delay in bringing suit. [pp. 1621–22: footnotes omitted]

24. Friedman contrasts that duty by plaintiff with the defendant's burden in connection with the affirmative defense of laches. *See also* Friedman's discussion at 431: "[P]rompt action after knowledge or notice of the facts \* \* \* is an element of the plaintiff's cause of action." However, Friedman (at 453) does note that some authorities hold that "loss of the power of rescission by delay must be pleaded as a defense." *And see* Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (9th Cir. 1962), 333 F.2d 568 (9th Cir. 1964); 2A J. Moore, Federal Practice 1853 et seq. (2d ed. 1968), and cases cited by Moore therein which indicate that unreasonable delay and the like are affirmative defenses to rescission which a defendant must raise under Federal Civil Rule 8(c).

Court gave to Hopkins that opportunity to amend its complaint and then afforded to Hutton the right affirmatively to plead unreasonable delay by Hopkins, because this Court believes that Hopkins, seeking rescission in a 10(b) or 17 action, does not have the burden, in such a suit which finds its genesis in common law precedents *and* in the remedial purposes of the '33 and '34 securities legislation, of pleading lack of unreasonable delay, and that obversely Hutton has the burden of affirmatively pleading such delay by Hopkins if Hutton is desirous of relying upon such delay as a bar to Hopkins' entitlement to rescission under 10(b) or 17. But, in any event, Hopkins has come forward, in this case, within the framework of Federal Civil Rule 56, to establish on the record Hopkins' own lack of delay. In cases appearing to involve lengthy delay, the burden of coming forward to establish lack of or reason for delay may shift to the plaintiff even if the initial pleading burden is upon the defendant. *See, e. g.,* Marsh v. Whitmore, 88 U.S. (21 Wall.) 178, 22 L.Ed. 482 (1874) ; Harwood v. Cincinnati & Chicago Airline R. R. Co., 84 U.S. (17 Wall.) 78, 21 L.Ed. 558 (1873) ; and Badger v. Badger, 69 U.S. (2 Wall.) 87, 17 L.Ed. 836 (1865), cited in *Twin-Lick, supra.* Friedman (at 452–53, quoted herein at p. 30 *supra*) places upon the would-be rescinder the burden of pleading lack of delay and perhaps also the burden of coming forward to establish such delay and then, if those burdens are met, shifts to the defendant the burden of at least matching the "coming forward" of the plaintiff. In this case, Hopkins, since this Court filed its last opinion, has come forward to establish lack of delay. Hutton, on the other hand, has not controverted that showing in any way. In addition, the present record in this case discloses that *neither* Hopkins *nor* Hutton zeroed in on the wrongdoing and the individual wrongdoers until the spring and summer of 1963. Under the circumstances, Hutton

cannot be heard to say, on the current state of the record herein, that Hopkins, in order to be entitled to rescission under 10(b) or 17, was required, more successfully, more extensively or more speedily, to "probe the data upon which [it] based [its] purchase" or any other data. Hopkins v. Hutton, 4 Cir., 422 F. 2d, *supra* at 1131.[25] That burden was enunciated in 1970 on the basis of the record then existing in this case by Judge Butzner in connection with Section 12(2) and its related Section 13 requirements—not in 1972 upon the present record in connection with 10(b) or 17 relief. To put it another way, Hutton, "the wrongdoer cannot [in a common law, or 10(b) or 17 proceeding] make extreme vigilance and promptitude conditions of rescission" by the wronged party, Hopkins. Pence v. Langdon, *supra.*[26] Nor may Hutton, faced with Hopkins' motion for summary judgment and the undisputed facts concerning lack of delay established by Hopkins in support of that motion, successfully take the position that Hutton is permitted to wait until trial to produce evidence that Hopkins knew or should have known of Hutton's wrongdoing at a time substantially prior to July 26, 1963 and that Hopkins should have accused Hutton thereof and demanded rescission prior to July 26, 1963. That conclusion is compelled whether Hutton, or Hopkins, would be required at trial to shoulder McCormick's third burden, i. e., the burden of persuasion. But it is a conclusion which is particularly required if Hutton, as would seem to be the case under the views expressed by the Supreme Court in Pence v. Langdon, *supra,* and indicated in the Restatement of Restitution, *supra,* would have to shoulder and meet that third and ultimate burden of proof, if this case should go to trial.

Accordingly, this Court holds that Hopkins may rescind its March 1, 1961 purchase of the oil production payment and hereby grants Hopkins' motion for summary judgment for rescission under

---

25. Quoted at p. 21 *supra.*

26. Quoted at pp. 25–26 *supra.*

Counts II, III and V. Hopkins shall present to this Court for its consideration a decree modelled upon the decree set forth at 297 F.Supp. 1165, 1237 et seq.